<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SPI PHARMA, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **ROBEN MANUFACTURING CO. INC.**, <br><br> Defendant. | Civil Action No. 21-4746 (ZNQ) (DEA) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion for Summary Judgment filed by Plaintiff SPI Pharma, Inc. ("SPI" or "Plaintiff"). ("Motion", ECF No. 29.) Plaintiff filed a Brief in Support of its Motion ("Moving Br.", ECF No. 32) and a Statement of Material Facts ("SMF", ECF No. 31.) Defendant Roben Manufacturing Co. Inc. ("Defendant") filed a Brief in Opposition to Plaintiff's Motion ("Opp'n", ECF No. 40) along with its Counter Statement of Material Facts ("CSMF", ECF No. 41.) Plaintiff filed a Reply to Defendant's Opposition. ("Reply", ECF No. 46.)

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT-IN-PART and DENY-IN-PART Plaintiff's Motion for Summary Judgment. The Court will GRANT Plaintiff's Motion for Summary Judgment with respect to Plaintiff's breach of contract, liquidated damages, and attorney's fees claims, but DENY the Motion with respect to Plaintiff's actual damages claim.

I.   **BACKGROUND AND PROCEDURAL HISTORY**

   A.   **THE PARTIES**

Plaintiff is a pharmaceutical and nutritional supplement company involved in manufacturing and supplying antacid actives, excipients, taste-masking technology, and drug delivery systems. Defendant is a manufacturing company that provides custom industrial solutions to fabricate, service, and repair evaporators, reactors, pressure vessels, storage vessels, tanks, columns, and heat exchangers as well as specialty sub-components in various alloys.

   B.   **PROCEDURAL HISTORY**

This action commenced on March 10, 2021 when Plaintiff filed its Complaint. ("Compl.", ECF No. 1.) The Complaint alleges one count for breach of contract arising out of an Equipment Purchase Agreement (the "Agreement") between the parties. (*See generally, id.*) The Complaint also contains a second count seeking to recover its attorneys' fees and costs pursuant to the Agreement. (*Id.* ¶¶ 61–62.) The deadline to complete fact discovery was January 31, 2022. (ECF No. 23.) Thereafter, on June 17, 2022, Plaintiff filed the instant Motion for Summary Judgment. No Motion to Dismiss was ever filed.

   C.   **UNDISPUTED FACTS**

On May 23, 2019, Plaintiff sent a request for proposal ("RFP") to Defendant and ICC Northwest ("ICC")—two different manufacturers—seeking proposals for the design, fabrication, and delivery of thirteen tanks and one evaporator (the "Equipment"). (SMF ¶ 1; CSMF ¶ 1.) Defendant submitted a proposal in response to the RFP, and the parties spent nearly two months negotiating the terms of an agreement. (*Id.* ¶ 2; *Id.* ¶ 2.) Plaintiff and Defendant also engaged in arms-length negotiations over a liquidated damages and early completion bonus provision. (*Id.* ¶ 8; *Id.* ¶ 8.)

On or about July 15, 2019, Defendant proposed a delivery date of the Equipment by Christmas 2019. (*Id.* ¶ 4; *Id.* ¶ 4.) On or about July 20, 2019, Defendant revised its proposal to offer delivery by December 20, 2019. (*Id.* ¶ 5; *Id.* ¶ 5.) Following further negotiations, on or about July 22, 2019, Defendant agreed to Plaintiff's required delivery date of December 10, 2019. (*Id.* ¶ 6; *Id.* ¶ 6.) The parties agreed to award Defendant an early completion bonus of 1% of the total project cost if Defendant delivered the Equipment one business week ahead of the December 10, 2019 Completion Date. (*Id.* ¶ 10; *Id.* ¶ 10.) Defendant had the lowest Purchase Order bid at $1,316,435. (*Id.* ¶ 11; *Id.* ¶ 11.) On or about July 19, 2019, Plaintiff and Defendant entered into their Agreement. (*Id.* ¶ 12; *Id.* ¶ 12.)

The intended purpose of the Agreement was to fabricate Equipment that Plaintiff would use "in connection with the manufacturing of products that [it] will sell to third parties for use as ingredients in pharmaceutical products for human and animal consumption." (*Id.* ¶ 13; *Id.* ¶ 13.) The Agreement "supersede[d] any earlier agreements, communications, or correspondence relating to the subject matter of the agreement." (*Id.* ¶ 14; *Id.* ¶ 14.) Pursuant to the terms of the Agreement, Defendant was to create drawings, procure and assemble materials, manufacture, test assemble, factory test, and certify conformity to design, and deliver fourteen tanks and one evaporator. (*Id.* ¶ 15; *Id.* ¶ 15.) Pursuant to Section 6.1 of the Terms & Conditions incorporated in the Agreement ("Terms & Conditions"), Defendant was required to "proceed expeditiously to complete all of the Services and deliver the undamaged Equipment and Software to [Plaintiff's] Site by the Date for Delivery." (*Id.* ¶ 18; *Id.* ¶ 18.) Defendant understood and agreed that it would use "[f]irst-class materials and workmanship . . . in all aspects of all items supplied" under the Agreement. (*Id.* ¶ 19; *Id.* ¶ 19.) The parties incorporated "Attachment 6" to the Agreement which governed liquidated damages and the early completion bonus. (*Id.* ¶ 20; *Id.* ¶ 20.)

Pursuant to the liquidated damages and the early completion bonus provision, the parties "recognize[d] the delays, expenses, and difficulties involved in proving the actual loss suffered by [Plaintiff] in the event of [Defendant's] failure to deliver the Equipment by the Completion Date." (*Id.* ¶ 21; *Id.* ¶ 21.) The liquidated damages and early completion bonus provision addressed the fact that any delays in the delivery of the Equipment would have a cascading effect on the rest of construction at the facility because the Equipment had to be installed in a specific order and pattern depending on the manufacturing floor; supporting structures and flooring had to then be built around the tanks; Plaintiff had to conduct evaluations, testing, and validation of the equipment to meet Food & Drug Administration regulations before starting production; and test batches of product had to be run and certified prior to fulfilling customer orders. (*Id.* ¶ 22; *Id.* ¶ 22.) The parties agreed that the amounts specified under the liquidated damages provision "reasonably approximate the actual damages that would be suffered by [Plaintiff] as a result of [Defendant's] failure to timely meet the Completion Date" and also agreed and acknowledged that the liquidated damages provision was not a penalty provision. (*Id.* ¶¶ 24–25; *Id.* ¶¶ 24–25.)

The parties also agreed that, if Defendant did not deliver all of the Equipment by the Completion Date, it would be liable to Plaintiff for liquidated damages based on the following schedule:

- Completion Date plus one five-day business week – 1% of total project cost;
- Completion Date plus a second five-day business week – $1% of total project cost;
- Completion Date plus a third five-day business week – 2% of total project cost;
- Completion Date plus a fourth five-day business week – 2% of total project cost.

(*Id.* ¶ 26; *Id.* ¶ 26.)  The parties agreed that any Damages assessed as a result of any claims, causes of action, or lawsuits in connection with the Agreement would include "reasonable legal and other professional fees and expenses."  (*Id.* ¶ 28; *Id.* ¶ 28.)

On or about August 27, 2019, Defendant disclosed to Plaintiff that it was facing delays with its heads supplier, which would delay the ultimate delivery of the Equipment.  (*Id.* ¶ 30; *Id.* ¶ 30.)  By early September 2019, Defendant disclosed that only three of the fourteen contracted-for tanks were expected to be delivered by the Completion Date.  (*Id.* ¶ 31; *Id.* ¶ 31.)  On or about September 30, 2019, Defendant disclosed that its heads supplier likely would not be able to deliver the heads necessary for the Equipment until December 13, 2019—three days after the contracted Completion Date.  (*Id.* ¶ 32; *Id.* ¶ 32.)  Defendant disclosed additional issues that would delay production and delivery including issues with its coil bending machine and delays caused by a shortage of welders.  (*Id.* ¶ 34; *Id.* ¶ 34.)  By September 30, 2019, Defendant admitted that none of the contracted-for Equipment was expected to be delivered by the Completion Date.  (*Id.* ¶ 35; *Id.* ¶ 35.)  On or about October 3, 2019, Defendant asked that Plaintiff waive the polishing requirement on the first four tanks because "[its] shell plate polisher [wa]s backed up with work and this process also adds two to three weeks additional . . . shop time support throughout fabrication process as well", to which Plaintiff agreed.  (*Id.* ¶¶ 41–42; *Id.* ¶¶ 41–42.)  Defendant failed to complete production on and deliver any of the Equipment by the Completion Date and ultimately only fabricated and delivered six tanks in May 2020.  (*Id.* ¶¶ 36–38; *Id.* ¶¶ 36–38.)

During the bidding process, Plaintiff received a proposal from ICC, which was the second lowest bidder.  (*Id.* ¶ 43; *Id.* ¶ 43.)  When Defendant disclosed that it would not be able to deliver the Equipment by the Completion Date, Plaintiff asked ICC to take over fabrication of all but six tanks of the Equipment, which ICC agreed to do at its previously submitted price.  (*Id.* ¶ 44; *Id.*

5

¶ 44.) To shift production of a portion of the Equipment to ICC, Plaintiff paid the cost of having work-in-progress tanks shipped from Defendant's facility in New Jersey to ICC in Oregon, and also paid ICC to conduct a quality check of Defendant's work. (*Id.* ¶ 46; *Id.* ¶ 46.) ICC ultimately completed production of seven of the thirteen tanks, and the evaporator. (*Id.* ¶ 47; *Id.* ¶ 47.) Plaintiff paid Defendant $1,024,657 and ICC $764,942.60. (*Id.* ¶¶ 49–50; *Id.* ¶¶ 49–50.)

## II.   JURISDICTION

The Court has original jurisdiction over the action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and involves citizens of different States.

## III.   LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id*. (quoting *Anderson*, 477 U.S. at 250).

6

"Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact.'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)).

## IV. DISCUSSION

### A. BREACH OF CONTRACT

Plaintiff first seeks summary judgment on its breach of contract claim. The elements of a breach of contract claim under Delaware law[1] are the existence of a contract, breach of an obligation imposed by contract, and resulting damage to the plaintiff. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). "When there is a written contract, the plain language of a contract will be given its plain meaning." *Phillips Home Builders v. The Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. Super. 1997).

The parties do not dispute that a valid contract existed. Instead, the parties dispute the breach of an obligation imposed by the contract and resulting damage to Plaintiff. Here, the Agreement between the parties became effective on July 19, 2019. (Agreement at 1.) Following further negotiations, on or about July 22, 2019, Defendant agreed to Plaintiff's required delivery date of December 10, 2019. (*Id.* at 2; SMF ¶ 6; CSMF ¶ 6.) The parties had also agreed that Defendant was to deliver drawings to Plaintiff by August 9, 2019. (*Id.*) Less than one month after

---

[1] Pursuant to the Agreement, Delaware law governs this dispute. (*See* ECF No. 30-1, Pl. Ex. 11, "Agreement", ¶ 18.2.)

the Agreement was executed, Defendant missed the first milestone under the Agreement by failing to deliver drawings for approval by August 9, 2019 and by August 27, 2019, Defendant disclosed to Plaintiff that it was facing delays that would ultimately result in Defendant missing the agreed upon delivery date of December 10, 2019.  (SMF ¶ 30; CSMF ¶ 30; Pl. Ex. 21, "Nolan Decl.", at 2.)  Instead, Defendant completed delivery of the six tanks for which it maintained responsibility by May 2020—21 weeks later than the agreed upon Completion Date.  (*Id.* ¶ 38; *Id.* ¶ 38.) Defendant argues that it has not breached the Agreement because Plaintiff delayed in providing its approval of the drawings and any delay that had occurred does not constitute a breach of the Agreement pursuant to the Agreement's force majeure clause.  (Opp'n at 5–7.)

          1.     Time is of the Essence Clause

"When time is of the essence in a contract, a failure to perform by the time stated is a material breach of the contract that will discharge the non-breaching party's obligation to perform its side of the bargain." *HFIN, Inc. v. Intel Corp.*, Civ. No. 1835-VCS, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).  "Delaware courts will generally give substantial weight to these provisions, and the presence of a time is of the essence clause usually prohibits the remedy of specific performance if the party fails to meet its contractual obligations within the specified time." *Twin Willows LLC v. Pritzkur,* Civ. No. 20-199, 2022 WL 3039775, at *7 (Del. Ch. Aug. 2, 2022). "Where there is a time is of the essence clause, 'the surrounding circumstances are ordinarily immaterial in excusing the [party's] delay in tendering performance on or before the specified date.'" *Id.* at *8 (quoting *Charamella v. Barley Mill Road Homes, Inc.*, 142 A.2d 515, 517 (Del. Ch. 1958)).

"When determining whether time is of the essence, the court looks to whether the contract language so states and whether the course of dealing between the parties implies that time was of the essence." *Pouls v. Windmill Estates, LLC*, Civ. No. SS08C-05-014, 2010 WL 2348648, at *6

8

Case 3:21-cv-04746-ZNQ-DEA   Document 49   Filed 06/27/23   Page 9 of 18 PageID: 700

n.10 (Del. Super. Ct. June 10, 2010) (citations omitted); *Brasby v. Morris*, Civ. No. 05C-10-022, 2007 WL 949485, at *3 (Del Super. Ct. March 29, 2007) (citations omitted) (denying motion for summary judgment where question of fact remained); *Silver Properties, LLC v. Ernest E. Megee, L.P.*, Ch. No. 1994, 2000 WL 567870, at *2 (Del. Ch. Apr. 27, 2000).

Here, the Agreement contains no explicit clause providing that time was of the essence. Instead, the Agreement merely states that "[Defendant] must (a) proceed expeditiously to complete all of the Services and deliver the undamaged Equipment and Software to [Plaintiff]'s site by the Date for Delivery, (b) ensure that each Milestone is achieved by the relevant Date for Milestone Achievement, and (c) achieve Completion by the Date for Completion." (Agreement ¶ 6.1.)

Accordingly, the Court looks to the course of performance between the parties to determine if a genuine issue of material fact exists as to whether there was an understanding between the parties that time was of the essence. Although it is undisputed that the Agreement does not contain an explicit "time is of the essence" clause, Plaintiff argues it was implied during the parties' negotiations. (Moving Br. at 5; SMF ¶¶ 3, 6; CSMF ¶¶ 3, 6.) Plaintiff points to a deposition which notes that the timeliness of tank completion and delivery was "mission critical" and "had to be on time." (Pl. Ex. 1, "O'Donnell Dep.", 68:4–18.) On the other hand, Defendant also points to testimony that Plaintiff "did not act or conduct itself as though time was of the essence or as if delays would cost it substantial sums." (Def. Cert. "Huhn Decl.", ¶ 23.) Neither side provided any additional facts or support to establish that time was of the essence. Accordingly, given the scant and contradictory evidence presented by the parties, the Court cannot find that time was impliedly of the essence based on the course of dealing between the parties. *See Brasby v. Morris*, Civ. No. 05C-10-022, 2007 WL 949485, at *4 (Del. Super. Ct. Mar. 29, 2007) (holding that, when the contract does not explicitly state that time was of the essence, the importance of timeliness

9

"will hinge on a reasonable interpretation of what could be implied by the dealings between the parties" and that "inquiry is fact specific, and it cannot be resolved [by] the court.").

        2.       Force Majeure Clause

Defendant argues that despite its untimely delivery, the Agreement's force majeure clause excuses its late deliveries. (Opp'n at 8.)  A force majeure clause defines an area of events that might excuse nonperformance within the contract period. *Gulf Oil Corp. v. F.E.R.C.*, 706 F.2d 444, 452 (3d Cir. 1983) (citing *United States v. Brooks-Callaway Co.*, 318 U.S. 120, 123-24 (1943)) (holding that a Federal Energy Regulatory Commission order constituted legal error on force majeure issue and discussing difference in application of force majeure clauses in warranty and non-warranty context). "As a general matter, [f]orce majeure clauses are . . . drafted to protect a contracting party from the consequences of adverse events beyond that party's control." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 287 (3d Cir. 2014) (citations omitted) (applying Delaware law to reject occurrence of force majeure event where real estate developer "encountered problems with groundwater which interfered with construction of the foundation" because "that [] is not what caused [the developer] to miss its contractual performance date; it missed that date because it had not previously moved diligently"). As with all contractual interpretation, however, a court must determine the intent of the parties from the contractual language. *Stroud v. Forest Gate Dev. Corp.*, Civ. No. 20063-NC, 2004 WL 1087373, at *5 n.25 (Del. Ch. May 5, 2004).

Section 6.4 of the Agreement contains the Force Majeure clause that states in relevant part:

> If (a) [Defendant] is unavoidably delayed in achieving Completion by a Force Majeure Even, and
>
> (b) neither [Defendant] or its Affiliates . . . have contributed to the delay, and
>
> (c) [Defendant] has used all best efforts to minimize the delay, and

> (d) [Defendant] has notified [Plaintiff] in writing of the existence of the Force Majeure Event and the length of the period of delay for which [Defendant] claims an extension as soon as reasonably possible after [Defendant] has become aware of it,
>
> [Plaintiff] will, by notice in writing to [Defendant], allow [Defendant] a reasonable extension to the Date of Completion . . ."

(Agreement ¶ 6.4.)

Although Defendant argues that the COVID-19 pandemic is a Force Majeure Event covered by the Agreement, and although Courts around the country have found that the COVID-19 pandemic is a force majeure event, Defendant's untimeliness is not excused by the Force Majeure clause. First and foremost, the parties had entered into the Agreement in July 2019, and agreed to a December 10, 2019 completion date—both dates well before the COVID-19 pandemic ensued. Secondly, Defendant's initial breach occurred on August 9, 2019 when it failed to timely deliver drawings for approval. Although Defendant points to the COVID-19 pandemic as a Force Majeure Event that caused its delays, the Court notes that the first COVID-19 symptoms in the world were reported on December 12, 2019 and the first case in the United States was reported on January 20, 2020.[2] *See* CDC Museum COVID-19 Timeline, https://www.cdc.gov/museum/timeline/covid19.html. Plaintiff, therefore, cannot raise a genuine issue of material fact with respect to its argument that the COVID-19 pandemic caused its delays.

Defendants cannot invoke the Force Majeure clause for a separate and independent reason: it is undisputed that it failed to provide Plaintiff with the required written notice of a Force Majeure Event under the Agreement. (SMF ¶ 30; CSMF ¶ 30; Agreement ¶ 6.4(d).) Instead, Defendant

---

[2] The Court may take judicial notice of facts regarding COVID-19. *L.T. v. Zucker*, Civ. No. 21-1034, 2021 WL 4775215, at *1 n.3 (N.D.N.Y. Oct. 13, 2021) ("The Court takes judicial notice of facts regarding the spread and lethality of COVID-19 as reported by dependable public health authorities."); *see also Hopkins Hawley LLC v. Cuomo*, Civ. No. 20-10932, 2021 WL 1894277, at *2 n.2 (S.D.N.Y. May 11, 2021) ("Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of facts that are 'generally known within the trial court's territorial jurisdiction. FED. R. EVID. 201. General facts regarding the COVID pandemic indisputably fall within Rule 201's purview.")

asserts for the first time in this motion that it experienced a Force Majeure Event. (Opp'n at 8.) Accordingly, because Defendant neglected to provide written notice of a Force Majeure Event, and has not raised a genuine issue of material fact with respect to the pandemic's severity in August 2019, the Court finds that Defendant's untimeliness cannot be excused by the Force Majeure clause. *See Functional Hiit Fitness, LLC v. F45 Training Inc.*, Civ. No. 22-10168, 2022 WL 17828930, at *13 (E.D. Mich. Oct. 26, 2022) (holding that, under Delaware law, a force majeure clause's "terms control [and Defendant] cannot ask th[e] Court to now insert a different obligation on [Defendant].").

### 3. Anticipatory Repudiation

Less than one month after the Agreement was executed, Defendant missed the first milestone under the Agreement by failing to deliver drawings for approval by August 9, 2019 and by August 27, 2019, disclosed to Plaintiff that it was facing delays which would ultimately result in Defendant missing the agreed upon delivery date of December 10, 2019. (SMF ¶ 30; CSMF ¶ 30; Nolan Decl. at 2.) Under general principles of contract law, an anticipatory repudiation gives rise to an immediate claim for total breach of contract damages against the repudiating party. Restatement (Second) of Contracts, § 243(2) (providing that "a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach."). The Delaware Supreme Court has previously looked to the Restatement (Second) of Contracts for a definition of "repudiation." *CitiSteel USA, Inc. v. Connell Ltd. Pshp., Luria Bros. Div.*, 758 A.2d 928, 931 (Del. 2000). The Restatement (Second) of Contracts defines "repudiation," in relevant part, as "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." Restatement (Second) of Contracts, § 250(b). Section 250 of the Restatement further defines the nature of an act that constitutes a repudiation: "In order to constitute a repudiation, a party's act must be both voluntary and affirmative, and must make it

12

actually or apparently impossible for him to perform." Restatement (Second) of Contracts, § 250, Cmt c.  Moreover, Delaware law provides that "[a]n anticipatory repudiation constitutes a breach." *Cochran v. Denton*, Civ. No. 11826, 1991 WL 220547, at *1 (Del. Ch. Oct. 8, 1991); *see also Carteret Bancorp, Inc. v. Home Grp., Inc.*, Civ. No. 9380, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988) (providing that a claim for breach of contract can be made under a theory of repudiation when the repudiation is "positive and unconditional").

Delaware courts have routinely held that an affirmative statement confirming that a party will miss an agreed upon deadline or a refusal to perform constitutes an anticipatory breach. *See, e.g., Bioveris Corp. v. Meso Scale Diagnostics, LLC*, Civ. No. 8692-VCMR, 2017 WL 5035530, at *10 (De. Ch. Nov. 2, 2017) (holding that the defendant's letter admitting it had no intention to satisfy the remaining balance of the agreement constituted an "unequivocal and unconditional" refusal to perform").  Moreover, Plaintiff's substitute contract with ICC to take over fabrication of all but six tanks of the Equipment (SMF ¶ 44; CSMF ¶ 44) also favors a finding of a breach of contract because Plaintiff engaged ICC as a result of Defendant's anticipatory repudiation.  *See West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, Civ. No. 2742-VCN, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009) (explaining that "repudiation amounts to a present breach . . . [o]nce the promisee relies on the repudiation . . . by engaging in a substitute transaction.").  Accordingly, Defendant's August 27, 2019 disclosure to Plaintiff that it would miss the agreed upon delivery date of December 10, 2019 constituted a breach of contract.[3]

---

[3] Because the Court has determined that Defendant breached the Agreement upon its anticipatory repudiation, it need not address Plaintiff's argument that that Defendant's faulty workmanship also constituted a breach of contract.

## B.     ACTUAL AND LIQUIDATED DAMAGES

### 1.     Actual Damages

Plaintiff also seeks actual and liquidated damages in its Motion for Summary Judgment. Plaintiff argues that it is owed liquidated damages pursuant to the Agreement for Defendant's breach, as well as actual damages for Defendant's failure to deliver the seven tanks and evaporator that was ultimately delivered by ICC. (Moving Br. at 17.) Defendant correctly points out, however, that a party cannot recover both actual and liquidated damages under Delaware law. *Gilbane Bldg. Co. v. Nemours Found.*, 666 F. Supp. 649, 652 (D. Del. 1985). That said, actual damages cannot be recovered when liquidated damages are agreed upon. *See Stone, Sand, & Gravel Co. v. United States,* 234 U.S. 270, 275 (1913) (noting that since claimant agreed to liquidated damages, he is not entitled to actual damages incurred as a result of the breach); *Leeseberg v. Converted Organics, Inc., 2009* U.S. Dist. LEXIS 93805, *9 (D. Del. 2009). *See also Rex. Trailer Co. v. United States*, 250 U.S. 148, 153 (1956) (liquidated damages are a "substitute" for actual damages where actual damages are "uncertain in nature or amount or are unmeasurable").

Plaintiff thereafter argues that it deserves actual damages separate and apart from the liquidated damages due to "damages arising from [Defendant]'s . . . faulty workmanship." (Moving Br. at 17; Reply at 9.) A genuine issue of material fact exists however as to the level of workmanship used on the Equipment ultimately delivered. Aside from self-serving testimony, Plaintiff makes conclusory allegations that Defendant used faulty workmanship to construct the tanks. Defendant correctly notes that if Plaintiff did in fact allege that the delivered tanks suffered from faulty workmanship, Plaintiff "failed to give [Defendant] an opportunity to repair or replace the allegedly defective item as required by the . . . Agreement's limited repair and replacement warranty." (CSMF ¶ 48; Huhn Decl. ¶¶ 34–35; Agreement at 12.) Plaintiff neither argues nor

14

provides any support that it contacted Defendant regarding the allegedly defective tanks—an obligation it had pursuant to the Agreement. Therefore, a genuine issue of material fact exists on the workmanship used on the tanks sufficient to overcome a motion for summary judgment. (Agreement at 12.) Moreover, Delaware courts have held that, "where professional negligence is the basis for a breach of contract claim, expert testimony is generally required to establish the standard of care applicable to that professional." *See Seiler v. Levitz Furniture Co. of E. Region, Inc.*, 367 A.2d 999, 1008 (Del. 1976). Plaintiff, however, has not provided any testimony with respect to the level of workmanship used on the tanks. Taking into consideration the unpersuasive evidence on which Plaintiff relies to prove faulty workmanship, a reasonable jury could return a verdict for the nonmoving party. Accordingly, the Court will deny Plaintiff's Motion for Summary Judgment with respect to actual damages.

### 2.    Liquidated Damages

Plaintiff next seeks liquidated damages for Defendant's breach of the Agreement. Pursuant to the Delaware Uniform Commercial Code[4]:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

6. Del. C. § 2-718; *see also Wilmington Hous. Auth. v. Pan Builders, Inc.*, 665 F. Supp. 351, 353 (D. Del. 1987) ("It is generally accepted that parties to a contract may agree on a fixed sum to be paid as liquidated damages to compensate the non-breaching party in the event of breach.").

---

[4] Under Delaware law, goods sold – including goods that are custom fabricated – are governed by the Delaware Uniform Commercial Code. *See Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261, 1265 (D. Del. 1983).

It is first important to note that, when a contract specifies a deadline or completion date for performance, a failure to complete performance by that agreed-upon date is a material breach entitling the non-breaching party to recover damages. *See, e.g., The Harford Mut. Ins. Co. v. B & B Env't Servs.*, Civ. No. 00-12-0051, 2001 WL 1555546, at *1 (Del. Com. Pl. July 5, 2001) (subcontractor breached agreement requiring work to be completed by certain date and time by failing to strictly comply); *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 277 (Del. Ch. 2003), *as revised* (Oct. 6, 2003) (purchaser of corporate assets breached agreement by failing to file Form S-3 registration statement with Securities & Exchange Commission within 90 days of transaction closing, as specified in purchase agreement); *see also* 17A Am. Jur. 2d Contracts § 594 ("It is a general rule that one who contracts to complete work within a certain time is liable for the damage for not completing it within that time, unless the delay is excused or waived. Thus, even though time is not of the essence of a contract, and the contractor fails to perform within the specified time, that person is still liable in damages for the delay.").

Here, the parties do not dispute the validity of the liquidated damages clause of the Agreement. (SMF ¶ 28; CSMF ¶ 28.) Instead, Defendant simply argues that it is not liable for the liquidated damages because it did not breach the Agreement. As described above, however, the Court has already determined that Defendant did breach the Agreement. In an attempt to avoid its liability under the liquidated damages clause, Defendant argues that Plaintiff's demands of drawing and design revisions constitute either an amendment or novation that ultimately extended the completion date and "which relieves [Defendant] of responsibility for damages for completion of the remaining tanks transferred by Plaintiff to ICC. . ." (Opp'n at 9.) Defendant, however, neglects to cite supporting authority and instead only references the "Change Order Amendments" between the parties as grounds to avoid liability under the liquidated damages clause of the

16

Agreement. (Opp'n at 9 (citing Def. Exs. 12, 13)). The Court has already noted that "unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read*, 397 F. Supp. 3d at 625. "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact.'" *Id*. (quoting *Katz*, 972 F.2d at 55). Moreover, Delaware courts have held that "[a] change order does not amend the contract . . . nor does it change any of the terms of the base contract." *Arcoria v. RCC Assocs.,* Civ. No. K13L-06-058, 2014 WL 620361, at *4 (Del. Super. Jan. 8, 2014). Therefore, Defendant's unsupported argument alone does not raise a genuine issue of material fact sufficient to avoid summary judgment. Accordingly, the Court will grant summary judgment with respect to Plaintiff's liquidated damages claim.

### C. ATTORNEY'S FEES

Lastly, Plaintiff argues that it is entitled to attorney's fees and costs pursuant to the Agreement. (Moving Br. at 21.) The parties do not dispute that the Damages clause of the Agreement includes "attorneys' fees and the like." (SMF ¶ 28; CSMF ¶ 28.) Instead, Defendant simply argues that it is not liable for damages and thus, not liable for attorney's fees and costs. However, because the Court has determined that Defendant is liable for damages pursuant to the liquidated damages clause of the Agreement above, Defendant is also liable for attorney's fees and costs.[5] Accordingly, the Court will grant Plaintiff's Motion for Summary Judgment with respect to attorney's fees and costs.

---

[5] The Agreement defines "Damages" as "all losses, damages, settlement amounts, judgments, liabilities, fines, penalties, costs, interest, taxes, and expenses (*including reasonable legal and other professional fees and expenses*) arising out of, resulting from, or relating or attributable to Claims. (Agreement ¶ 1.1(g).) "Claims," in turn, is defined as "claims, complaints, causes of action, lawsuits, or other similar proceedings." (*Id.* ¶ 1.1(d).)

## V.     CONCLUSION

For the reasons stated above, the Court will GRANT-IN-PART and DENY-IN-PART Plaintiff's Motion for Summary Judgment.  The Court will GRANT Plaintiff's Motion for Summary Judgment with respect to Plaintiff's breach of contract, liquidated damages, and attorney's fees claims, and DENY Plaintiff's Motion for Summary Judgment with respect to Plaintiff's actual damages claim.  An appropriate Order will follow.


Date: **June 27, 2023**

                                        s/ Zahid N. Quraishi
                                        **ZAHID N. QURAISHI**
                                        **UNITED STATES DISTRICT JUDGE**